IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SHANE STADTMILLER,           )
                Plaintiff    )
                              )
     vs.                    )    Civil Action No. 09-884
                              )
UPMC HEALTH PLAN, INC.,    )
                Defendant  )


## MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is the motion for summary judgment (ECF No. 39) filed by the

defendant UPMC Health Plan, Inc. ("UPMC" or the "Defendant"), with respect to claims made

by Shane Stadtmiller ("Stadtmiller" or the "Plaintiff") in his five-count, third amended

complaint.  (ECF No. 36).  Count I is premised on the Uniformed Services Employment and Re-

Employment Rights Act ("USERRA"), 38 U.S.C. § 4301-33.  Count II is brought pursuant to

Pennsylvania's Military Affairs Act, as amended, 51 PA. CON. STAT. §§ 7301 et. seq.  In count

III, the Plaintiff alleges wrongful discharge under Pennsylvania law.  Count IV is based upon

alleged violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101

et seq., and count V sets out a claim under Section 504 of the Rehabilitation Act of 1973 ("RA"),

29 U.S.C. § 794.[1]  Having considered the joint concise statement of material facts (ECF No. 59),

the other submissions of the parties, and the undisputed facts of record, and having viewed all

---

[1] "'In light of the similarities between  . . . the ADA and RA and their implementing regulations, [the Court] construe[s] and appl[ies] them in a consistent manner.'"  Disabled in Action in Pa. v. SEPTA, 635 F. 3d 87, 91 n.5 (3d Cir. 2011) (quoting  Pa. Prot. and Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,  402 F.3d 374, 379 n.3 (3d Cir. 2005).

disputed facts and all reasonable inferences drawn therefrom in favor of the Plaintiff, the court

will grant the Defendant's motion for summary judgment.

## <u>Factual and Procedural Background</u>[2]

The Plaintiff entered military service in 2000, when he was commissioned as a second

lieutenant in the U.S. Army.  He served as a platoon leader in the Republic of Korea, and later

"as a member of the faculty and staff at the United States Military Academy at West Point, New

York."  (ECF No. 36 ¶ 4).  Stadtmiller was deployed to Iraq in January 2005.  (<u>Id.</u> ¶ 5; ECF No.

48 at 2).  Soon after arriving in Iraq, the Plaintiff caught his right hand in the door of a Humvee,

breaking at least one finger and suffering shortening of the other fingers on that hand.

(Stadtmiller  Depo. 41-42,  Feb. 13, 2010 (ECF No. 42-1 at 43-44)).  As a result, he is unable to

"write for long periods of time and [his] handwriting isn't as good as it used to be."  (Stadtmiller

Depo. 42 (<u>Id</u>. at 44)).  In April 2005, the Plaintiff suffered additional injuries as a result of

shrapnel thrown by a "vehicle borne improvised explosive device."  (Stadtmiller Depo. 50 (ECF

No. 42-2 at 3)).  During his deposition, Stadtmiller testified that after the explosion, he became

sensitive to light and loud noises, suffered anxiety when startled, found it "terribly troublesome"

to work with his back to the door, experienced cluster headaches and tinnitus, could not

concentrate or multitask, and had impaired recall.  (Stadtmiller Depo. 38-40 (ECF No. 42-1 at

40-42)).  Despite these difficulties, Stadtmiller remained in Iraq until February 2006.

(Stadtmiller Depo. 45 (<u>Id</u>. at 47)).  Upon his return to the United States, he assumed the position

of project liaison officer for the Joint Interagency Training Center in Kingswood, West Virginia,

(Stadtmiller Depo. 36 (<u>id.</u> at 38)), and, from 2007 through 2008, served as a company

commander in the West Virginia National Guard.  (ECF No. 36 ¶6).

---

[2]  This portion of the opinion sets forth the general background.  Other relevant facts are discussed <u>infra</u> in
connection with specific issues.

Stadtmiller was scheduled to enter the Army's Captain's Career Course in November 2007, but instead accepted a position as a project manager in UPMC's Quality Assurance Department. (Stadtmiller Depo. 62 (ECF No. 42-2 at 15; ECF No. 36 ¶ 10)). Stadtmiller located this position though Hire Heroes USA, a job placement service for disabled veterans. (ECF No. 48 at 2). Gregory Peaslee ("Peaslee"), a UPMC senior vice president, directed UPMC's resource staff to work with Hire Heroes USA in order to match military veterans with UPMC job vacancies. After reviewing Stadtmiller's resume,[1] Peaslee asked that the Plaintiff be interviewed (ECF No. 41 ¶¶ 6–12).[3] It is undisputed that at the time of the interviews and at the point in time Stadtmiller was hired, Colleen Walsh ("Walsh"), who was ultimately responsible for the hiring decision, was aware that the Plaintiff was an officer in the National Guard, and would have periodic service commitments. (Walsh Depo. 40, May 12, 2010 (ECF NO. 42-9 at 13)). During the Plaintiff's interview with Walsh, she did not inquire about the nature or extent of his disabilities, and Stadtmiller did not volunteer this information. (Walsh Depo. 54-57 (Id. at 17)).

During her deposition, Walsh, who was Stadtmiller's supervisor, explained her conviction that the skill set, reflected in Stadtmiller's resume made him an excellent candidate for the project manager position. He was skilled at leading teams, having accountability, and tracking what was happening. He led and mentored over a hundred people, had operation of classes as a training component, strong management and organization. He multi-tasked frequently and was skilled and successful in performing those tasks:

---

[3] The UPMC Job Listing, listed eight essential functions and responsibilities of the position: 1) detailed planning, design, and implementation of quality improvement projects, and assistance in development of project strategy; 2) analysis; 3) identification of trends in expenses, utilization, medical quality, and other areas; 4) investigation of variances and deriving solutions to cost increases and quality issues, including implementation and monitoring effectiveness of solutions; 5) performing cost/benefit analysis; 6) monitoring the performance of UPMC's Health Plan against regional, national, and international benchmarks; 7) assisting team members in resolving project problems, escalating issues when necessary, and facilitating decision-making; and 8) assisting clients throughout projects in developing project documentation, monitoring tasks, resolving issues, and during implementation. (ECF No. 42-10 at 1).

> The skills are leading teams and having accountability and
> tracking what was happening, and he had those skills . . .
> He has in here that he leads and mentors over a hundred
> people, so that's management, . . . and specifically,
> he had an operation of classes as a training component,
> . . . strong leading management . . . and organization in those
> kind of things.  He talks in here about using Excel matrix . . . .
> He obviously multi-tasked  a lot  . . . and was skilled  . . . and
> was successful in doing that.

(Walsh Depo. 50-51(Id. at 16)).

Stadtmiller began work at UPMC on November 19, 2007.  (ECF No. 42-10 at 6).  He was immediately assigned two mentors, or "preceptors," Sherry Askey ("Askey") and Louise Dobbins ("Dobbins").  These women worked with the group to which the Plaintiff was assigned. They "supported him and his learning team, mentoring him through his tasks that he could see what he was supposed to be doing."  (Walsh Depo. 65 (ECF No. 42-9 at 19)).  Until January 2008, Stadtmiller "didn't have a whole heck of a lot to do."  (Stadtmiller Depo. 98 (ECF No. 42-3 at 1)).  He shadowed other project managers and observed "probably a handful of meetings," so that he could learn.  (Stadtmiller Depo. 98-99 (Id. at 1-2)).  He asked a lot of questions, "try[ing] to get familiar with the terminology, vernacular, and that was about it."  (Stadtmiller Depo. 99 (Id. at 2)).  This situation lasted about six weeks, until "a lot of folks" returned from vacations.  (Stadtmiller Depo. 99 (Id.)).

One of Stadtmiller's first assignments was data entry, which was to be carried out with another project manager, Marlie Bruno ("Bruno").  (Walsh Depo. 76 (ECF No. 42-9 at 22)). Walsh described this project as a "simple" task.  (Walsh Depo. 83 (Id. at 24)).  She, however, was almost immediately disappointed with Stadtmiller's performance.  "[Bruno] . . . repeatedly asked Mr. Stadtmiller to please ask questions because his work was not satisfactory. . . ."  (Walsh Depo. 77 (Id. at 22)).  "[D]aily performance deficiencies were . . . reviewed with him."  (Walsh

Depo. 79 (<u>Id.</u> at 23)). "[A]t least 50 percent of [his] work was done incorrectly, [and] the repeated effort to have this done correctly and showing him the errors, actually resulted in us [sic] having somebody else do it." (Walsh Depo. 81 ((<u>Id.</u>)). During her deposition, Walsh testified:

> [Stadtmiller] was aware of the errors and . . . his response, [was] that the system [was] slow and that he was distracted. And then it got to a point in time , . . . that [this information] needed entered, and this 50 percent error, this needs to be very accurate. And because of this business risk of this being incomplete and untimely, someone else completed this.

(Walsh Depo. 83 (<u>Id.</u> at 24)). Walsh testified that she asked Bruno to prepare a memo documenting her experience with Stadtmiller's work. (Walsh Depo. 78 (<u>Id.</u> at 23)). "[T]here were opportunities for improvement here and because there were performance issues, and the business strategy is at risk with this type of performance. And it was a lot of work for her to do this oversight, and so I asked her to put her experience to paper." (Walsh Depo. 78 (<u>Id.</u>)).

Bruno's notes indicated that following a sample review of Stadtmiller's data entries, she talked with him "about the importance of systematically reviewing [and] organizing data entry to minimize errors." (ECF No. 42-10 at 8). Another project manager working with the Plaintiff on the data entry project, James D'Alessandro ("D'Alessandro"), was similarly inexperienced. (Walsh Depo. 79-80 (ECF No. 42-9 at 23)). Bruno's audit showed that D'Alessandro had an abstraction error rate of ten percent, while Stadtmiller's was "at least 50%." (ECF No. 42-10 at 8). On January 11, 2008, Bruno met with Stadtmiller to review the audit results. Stadtmiller "did not want to review the records . . . but said that he got distracted because the system was slow and he got confused about what to enter because [the] documentation did not look alike." (<u>Id.</u>). According to Bruno, "[t]he records reviewed by [Stadtmiller] were not acceptable." (<u>Id.</u>).

The record does not show that Stadtmiller attributed his distraction to the location or configuration of his work space, or that he raised any issue with the lighting in his cubicle.

When Stadtmiller was hired, the Quality Control Department was responsible for monitoring certain quality control outcomes via a program known as the Health Employer Information Set ("HEDIS"). (Walsh Depo. 21 (ECF No. 42-9 at 8)). At her deposition, Walsh described the HEDIS process as follows:

> [T]he HEDIS measures, are clinical measures. So if I were to choose diabetes or rheumato[id] arthritis, many of our members have had the services that they should related [sic] to those conditions. So if you are a diabetic, you should have four different services done. We have the rate for each of those services for our members. . . . We know annually the final rate for each of these measures and there are close to 70 of them.
>
> On a monthly basis, we also produce these rates. And so on a monthly basis, the project managers would have the opportunity to know what the rate was, . . . we would actually know if the rate was improving, so hence the monthly knowledge for opportunity and improvement.

(Walsh Depo. 29-30 (Id. at 10-11)).

None of the project managers had worked with HEDIS prior to coming to UPMC. At some point in or prior to January 2008, Stadtmiller was assigned responsibility for the musculoskeletal work team. (ECF No. 42-10 at 27). Bruno's notes, as identified by Walsh, reflect that on January 11, 2008, Bruno and Stadtmiller "talked at length about the HEDIS project and the work plan in particular." (Id. at 8). Bruno noted Stadtmiller's statement that he was "feeling overwhelmed and . . . confused." (Id.). She "tried to answer his questions," and suggested "he read more about the HEDIS project." (Id.). She gave Stadtmiller her "Work Plan to integrate into his." (Id.). The two agreed to meet for further discussion. On January 16, 2008, Bruno wrote that although Stadtmiller had agreed to follow-up questions relating to the

work plan, "[t]o data [sic], he ha[d] not initiated that contact." (Id.). Walsh made notes dated January 23, 2008 about shortcomings in Stadtmiller's work, commenting on his lack of attention to detail, his problem sitting through meetings, and his failure to ask questions. (Id. at 9).

On February 12, 2008, Stadtmiller returned to human resources an employment health inventory form that indicated that he did not have disabilities, limitations or physical work restrictions. (Czyzewski Depo. 103-04 (ECF No. 42-8 at 29); Lipscomb-Jones Depo. 124, May 27, 2010 (ECF No. 42-12 at 34)). Later that month, he told a number of his co-workers, including Dobbins and D'Alessandro, that he could be redeployed to Iraq within the next eighteen months. (Stadtmiller Depo. 124 (ECF No. 42-3 at 37). Their reaction was essentially neutral. (Stadtmiller Depo. 135 (Id. at 38)).

On March 7, 2008, Walsh documented shortcomings in Stadtmiller's work, stating that the musculoskeletal work plan was incomplete, and that the tasks listed in the plan were not generated by the work group, but were instead "what [Stadtmiller] thought." (ECF No. 42-10 at 10). Walsh had been told that the plan was very poorly run.[4] Because Stadtmiller had not brought a work plan to the meeting, the "group had no focus." (Id.). Walsh told the Plaintiff that it was "his responsibility to maintain [the] workplan [and] use [it] to drive [the] meeting." (Id.) Tasks and the status of those tasks were unclear. Although Stadtmiller had been instructed to

---

[4] One of Stadtmiller's co-workers on this project, John Ursiny ("Ursiny") testified in his deposition that he had difficulty with Stadtmiller's work: "I have no idea what Shane created, but he did not use the template. He kind of went off on his own and was not complete." (Ursiny Depo. 43, June 29, 2010 (ECF No. 42-11 at 14)). Ursiny had to redo the project to make it acceptable for presentation to Walsh at their weekly meeting. (Ursiny Depo. 44 (Id.)). Other project managers assisted Stadtmiller. Askey, in particular, gave him tips and guidelines regarding the work and Walsh's managerial style. Stadtmiller was not "following the normal new employee learning curve." (Ursiny Depo. 59 (Id. at 18)). According to Ursiny, Stadtmiller's work did improve over time; "[H]e did make progress, did make some improvement." (Ursiny Depo. 84 (Id. at 24)). Ursiny recalled that Stadtmiller fell asleep during meetings. "There were instances in the meetings where we would look over to him and notice that he was nodding off. Not sound asleep, not snoring, just he would fall asleep in a meeting." (Ursiny Depo. 106 (Id. at 30)). Ursiny was not surprised to learn that Stadtmiller's employment was terminated because "his work did not meet up with the requirements of the job." (Ursiny Depo. 113 (Id. at 32)).

review the project format with the other project managers, he only briefly did so. Walsh reviewed the working plan with him in detail so that it could be revised. She reiterated the need to ask questions. During Walsh's deposition she stated that she attended Stadtmiller's weekly musculoskeletal meetings:

> [T]o show him how to do it. And I went to watch him do it and the intention of what the meeting was about, and what people were saying and how he needed to proceed, and his performance was very poor. In work group meetings, . . . what we are doing from one week to the next, among all of us as a team, he was not able to participate . . . . He just didn't.

(Walsh Depo. 133-34 (ECF No. 42-9 at 36-37)).

Walsh's notes reflect that early in March 2008, she met with Stadtmiller and another project manager in order to begin a HEDIS work plan, which was essentially an internal quality control assessment. (Walsh Depo. 103 (Id. at 29)). She reflected that "Stadtmiller needs closely monitored [and] mentored [sic] at this time." (ECF 42-10 at 10). On March 20, 2008, Walsh observed that the HEDIS work plan had not been updated since the March 14, 2008 meeting and noted that "[she] needed to reference [her] notes in order to manage [the task]. Unacceptable to business risk." (ECF No. 42-10 at 11).

This same day, Walsh asked Stadtmiller how he was progressing. He responded that he was not grasping the concepts and could not manage a work group without Walsh being present. Walsh wrote that the Plaintiff fell asleep in the March 14, 2008 meeting, and was not taking notes. He was nearly thirty minutes late for the meeting on March 20, 2008. When asked to explain why he was late, Stadtmiller stated that he went to get lunch and by the time he returned, the meeting was over. His work plans were not updated, even with Walsh's direction. Too much reworking and revision were required. (Id. at 12). Walsh told Stadtmiller that she

expected him to attend other project managers' meetings as an observer, that his work plans needed to be updated and submitted for her review, and that he was required to report to meetings on time and remain engaged. (Id. at 13). When Stadtmiller commented that he did not know what to prepare between meetings, Walsh told him that this uncertainty resulted from having an incomplete work program. She reiterated that things had devolved to a point where she

> at times, did his work. [She] conducted his meetings for him so he could watch, and then we would follow up on that specifically on what the work plan and what the tasks were and how to do that. I gave him very targeted drive dates for having something done and then we would meet on that to look and see how that was progressing.

(Walsh Depo. 87 (ECF No. 42-9 at 25)).

At the conclusion of the March 20, 2008 meeting, Walsh gave Stadtmiller an Employee Assistance Program ("EAP") referral. She stated that she made this referral in order to see if EAP might suggest ways to alleviate Stadtmiller's work-related problems. She did this either shortly before learning of Stadtmiller's disabilities or immediately afterward. Either way, she promptly initiated this effort to secure help for Stadtmiller. [5]

On March 31, 2008, Walsh gave Stadtmiller a document titled "Orientation Period Performance Warning." (ECF No. 42-10 at 27). Prior to preparing this document, Walsh contacted a human resources representative, Kimberly Lipscomb-Jones ("Lipscomb-Jones"),and shared Walsh's concerns about Stadtmiller's performance with her. Lipscomb-Jones "advised [Walsh] of the steps of corrective action that would be appropriate in the orientation period for

---

[5] According to Stadtmiller it was at or around the time of this meeting that he first made Walsh aware of his combat-related disabilities. (Stadtmiller Depo. 85 (ECF No. 42-2 at 38)). Walsh disputes the timing of Stadtmiller's revelation, stating that she knew nothing about Stadtmiller's condition until April 9, 2008. (Walsh Depo. 110-11 (ECF No. 42-9 at 31)). Her notes support her recollection.

six months of employment and told [Walsh] that if she felt it was at this point, then she should provide the documentation." (ECF No. 42-12, Ex. F at 27). Walsh drafted the warning, notifying Stadtmiller that he was "not meeting performance expectations," and had not progressed adequately for [his] responsibilities." (ECF No. 42-10 at 27). Stadtmiller was informed that "[f]ailure to show immediate and sustained improvement" during his orientation period would "result in termination of [his] employment." (Id. at 28). Walsh set out Stadtmiller's shortcomings in detail. With respect to his role on the musculoskeletal work team, Walsh wrote that the work plan began well, "but as meetings progressed, [the] workplan [was] not reflective of all tasks." (Id. at 27). Other members of the work team complained to her that the meeting, in addition to having been poorly run, was pointless, because Stadtmiller did not prepare a team work plan. When a plan was developed with Walsh's assistance, Stadtmiller failed to set interim reporting tasks, and did not understand the project's simple required elements. Stadtmiller admitted that he had to "manipulate[ ] the document probably 12 or 15 times trying to push it along." (Stadtmiller Depo. 116-117 (ECF No. 42-3 at 19-20)).

Walsh's criticism of Stadtmiller's performance on the HEDIS administrative work team was equally pointed. At each of three meetings attended by this team, the work plan was inadequate in that Stadtmiller failed to incorporate information generated at prior meetings, or to update the status of work to be completed. (ECF 42-10 at 20-28.) He was thirty-five minutes late for the first scheduled meeting of the "Cactus Credentialing Team." (Id. at 28). He arrived as the meeting was ending, explaining that "[he] had gone to lunch . . . after 1 p.m. and did not know where [the] meeting was held." (Id.). Deficiencies in the data entry project to which he was first assigned were also reviewed. Walsh wrote:

> You fell asleep in a QI team meeting I was running, which is a
> clear violation of UPMC policy. You got up and left the meeting

for awhile and returned. When asked about this you stated you were tired and since you were having difficulty understanding what we were discussing, you fell asleep. You did not express a lack of understanding of the meeting topics until I approached you about sleeping.

(Id.).

The warning set three immediate performance requirements. First, Stadtmiller was directed to manage work team meetings consistently and with focus. Work plans were to be timely, accurate, complete, and useable. Sleeping at meetings was to cease, and there was to be immediate attention to detail and meeting attendance. (Id.). Stadtmiller signed the document.

According to Stadtmiller, he was unaware that Walsh was dissatisfied with his work until he received the March 31, 2008 warning. Prior to that time, she had criticized his work, "but [he] didn't think anything was out of the ordinary me being so new to the environment." (Stadtmiller Depo. 94 (ECF No. 42-2 at 47)). He remembered Walsh saying that he should be further along, but he did not know that Walsh felt that he was having difficulty getting his work done. "No. I would always get my work done. It was a matter of she said I was having a problem grasping the concepts." (Stadtmiller Depo. 95 (Id. at 48)). According to Stadtmiller:

> I thought it was just everything was constructive criticism. She didn't inform me. I come from the military. I have thick skin. Constructive criticism is good. You move on and carry out the mission, but I didn't realize until the 31st this laundry list of strange things was actually what she thought, not what she thought but what she was telling me.

(Stadtmiller Depo. 96 (Id. at 49)). The transcript of Stadtmiller's deposition reflects the following exchange:

> Q   How did you get the [warning] in March of 2008?
>
> A   This is where she sat me down for my three-month counseling and she told me this is standard for new hires, they get a three-month counseling, and we

discussed things I need to improve.

\* \* \* \*

Q    You understood at the conclusion of this meeting
     that you had to show immediate and sustained
     improvement or you might lose your job?

A    It wasn't explained that I would lose my job in
     those terms, but she said I needed to improve.

Q    Doesn't it say failure to show immediate and
     sustained improvement or violation of any UPMC
     or department policy during your orientation period
     shall result in the termination of your employment?

\* \* \* \*

Q    Was that your understanding following your receipt
     of this?

A    No.  Verbally she said just improve on these things
     and everything will be okay.  I discussed the things I
     didn't agree with, and I admitted that I needed to
     improve in a few areas and that's it.

(Stadtmiller Depo. 100-01 (ECF No. 42-3 at 3-4)).[6]

On April 7, 2008, Walsh documented multiple problems that surfaced in Stadtmiller's

handling of that day's musculoskeletal group meeting.  (ECF No. 42-10 at 16).  The problems

included his failure to understand why questions he was asking were not valid, and his inability

to pinpoint the logical next steps in carrying out the plan.  In addition, he had not completed an

_____

[6] When Stadtmiller was asked how he spent his time day-to-day, he responded that he "really didn't get a
chance to do [his] duties.  I mean, there was a period of time when I sat without a whole heck of [a] lot to
do but just follow someone around."  (Stadtmiller Depo. 68 (ECF No. 42-2 at 68)).  When asked whether
he viewed this as part of his training, he replied: "No.  You're not going to learn by just sitting and
watching.  You have to be actively engaged, concrete experience."  (Stadtmiller Depo. 148 (ECF No. 42-
4 at 1)).  He stated that after the March 31, 2008 warning, (which he referred to as a "counseling") Walsh
did not criticize his work, but was mostly positive.  (Stadtmiller Depo. 116-17 (ECF No. 42-3 at 19-20)).
He insisted that his work performance had been satisfactory, and that he had not been given the tools he
needed to succeed.  (Stadtmiller Depo. 148-49 (ECF No. 42-4 at 1-2)).  "My performance was satisfactory
. . . [I]f you're on a losing football team, that doesn't make you a terrible football player."  (Stadtmiller
Depo. 149 (Id. at 2)).

information gathering task assigned to him more than a month earlier, or asked questions prior to the meeting.  Walsh wrote that Stadtmiller "feels he is prepared but is not."  (Id.)

Walsh's memorialized in her notes a meeting with the Plaintiff on April 9, 2008.  She reviewed Stadtmiller's revised osteoarthritis and rheumatoid arthritis work plans, remarking that they were "clearer and complete."  (Id. at 17).  Walsh noted that she made clear to project managers the day before that she would email work groups advising them about a transition to quarterly meetings.  Before she could do so, however, Stadtmiller notified his own work group that they would no longer meet on a monthly basis.  When Walsh asked him why he had done this on his own, he "stated that he wanted to be 'aggressive.'"  (Id.).  Walsh explained that his announcement was "premature," inconsistent with her directions, and that there was "no need for aggression."  (Id.)  Walsh's notes contain the following description of Stadtmiller's condition:

> Shane became tearful and asked to speak frankly.  He [said that] he had a traumatic brain injury in Iraq in 2006.  He has experienced cognitive difficulties such as short term memory problems.  His education from MBA-statistical etc., he now can't do.  He was on medication for [post-traumatic stress syndrome] but not currently.
>
> Stated attempting to work tasks for job was cloudy [and] unclear.  He needed to re-learn all tasks post-injury, i.e., identifying a pen from a pencil.
>
> Stress difficult – such as traffic.  His injury involved  . . . a vehicle – traffic patterns stress trigger.  With starting early in day (7:30) he can mostly avoid traffic stress.
>
> Shane stated he [had gone] to EAP from referral info I gave him.  He said EAP helped him see a physician  – who restarted him on his medication.  He has [diagnoses of] Traumatic Brain Injury (TBI) [and] post-traumatic stress syndrome.  He has an appointment with a neuropsychologist through UPMC insurance [and] is trying to see a VA doctor for TBI treatment, but VA can take many months for visits.

(Id. at 17-18).

Throughout the month of April 2008, Walsh "constant[ly]"[7] reviewed, monitored and talked with Stadtmiller about his work plans. (Walsh Depo. 137 (ECF No. 42-9 at 37)). By April 30, 2008 there was improvement in Stadtmiller's musculoskeletal project. Walsh observed, however, that this improvement was a long time coming. The project was "extremely simple and it took [Stadtmiller] many many months to get [it] done. There [was] not improvement on keeping attention to detail and organization. He knew he had another project due and he paid no attention to it." (Walsh Depo. 152 (Id. at 41)). On April 30, 2008, Stadtmiller had yet to complete what Walsh characterized as a straightforward comparison between two years of data – the assignment he had been given at the end of March 2008. Stadtmiller attributed the delay in collecting this data to Ursiny not having the date to give to him. (ECF No. 51- 9 ¶ 11). Walsh "explained this project to him again [and] gave him . . . two weeks . . . to try to get this done, knowing that [she] had . . . asked him to start working on it a month prior to that." (Walsh Depo. 139 (ECF No. 42-9 at 38)). When she checked with the Plaintiff on May 5, 2008, the status of the project was unchanged. (Walsh Depo. 139-41 (Id.)). The same was true on May 8, 2008. (Walsh Depo. 142 (Id. at 39)).[8] Walsh stated that

---

[7] Stadtmiller disputes the frequency of his meetings with Walsh.

[8] In early May 2008, Walsh began a closer observation of Stadtmiller's attendance. She noted that on May 2, 2008, he left for a dentist's appointment without telling her. (ECF No. 42, Ex. D at 153). On May 5, 2008, he left a 2:00 p.m. HEDIS meeting after forty-five minutes, explaining that "he had work to do." (Id. at 157-58). He left his cubicle without locking his computer. (Id. at 155-57). One of the Plaintiff's co-workers reported that Stadtmiller commented that her office had a good view of the Duquesne campus, and would be a "good place for a sniper wanting to take someone out." He also told her that the police were called when he engaged in a fight "with a man who was bothering his wife." (Id. at 160-61). He read an email on the same co-worker's computer screen, asked who had sent it, and stated that he found it to be "inappropriate." (Id. at 160). Another of Stadtmiller's co-workers told Walsh that he observed Stadtmiller take a knife from his pocket and cut away part of a fence around the former St. Francis property. (Id. at 178). A third co-worker who walked with Stadtmiller to the parking garage stated that Stadtmiller got on a child's bicycle that was parked on the street, and, after getting off, threw the bicycle over a fence. (Id. at 180). Walsh contends that none of this information – aside from Stadtmiller's absences from work and meetings – figured in her decision to terminate his employment. "There was so much going on with his work performance, so I continued to focus on that, and my goal was just to let HR know about this situation and let them deal with it." (Id. at 163, 219).

completion of the project required a comparison of data for two years. (Walsh Depo. 195 (<u>Id.</u> at 52)). Stadtmiller's first request for data pertained to only one of those years, and was not made until May 6, 2008. (Walsh Depo. 194-97) (<u>Id.</u> at 52)). Walsh responded that Stadtmiller misunderstood what he was supposed to obtain, and mistakenly concluded that the information was unavailable. (Walsh Depo. 196 (<u>Id.</u>)).

On May 8, 2008, Walsh told the Plaintiff that his performance required immediate improvement. (ECF 42-10 at 24). She identified a number of areas requiring attention, including the need for focus in the management of work team meetings, the ability to multi-task, and the importance of completing work that is "timely, accurate, complete, [and] usable." (<u>Id.</u>). She commented on specific projects, noting that Stadtmiller did not understand the 2009/2009 work plan or the intent of the RHU project, despite multiple explanations. Walsh shared this information with Lipscomb-Jones the same day. (Lipscomb-Jones Depo. 112 (ECF No. 42-12 at 31)).

On May 9, 2008, Walsh met with Lipscomb-Jones. (Lipscomb-Jones Depo. 109 (<u>Id.</u>)). According to Lipscomb-Jones, there had not yet been a "definite decision" to terminate Stadtmiller. (Lipscomb-Jones Depo. 110 (<u>Id.</u>)). "[H]is manager was still expressing concerns that ultimately led, within the next several days, to that decision being made and followed up on." . (Lipscomb-Jones Depo. 111 (<u>Id.</u>)). On the same day, Lipscomb-Jones shared Walsh's concerns with her supervisor, Sharon Czyzewski, vice president of Human Resources. (Lipscomb-Jones Depo. 118 (<u>Id.</u> at 33)).

Walsh made the decision to terminate Stadtmiller a couple of days later, and Lipscomb-Jones assisted with the necessary paperwork. (Lipscomb-Jones Depo. 110 (<u>Id.</u> at 31), Lipscomb-Jones Depo. 121 (<u>Id.</u> at 34)). This documentation included both a letter to Stadtmiller from

Walsh notifying him that his employment would be terminated effective May 15, 2008, and a Corrective Action /Discipline Authorization Form dated May 13, 2008. (ECF No. 42-6 at 1-3). Both of these documents outlined performance-related issues. In a document dated May 15, 2008, Tim Holt ("Holt"), senior human relations consultant, documented observations made during the course of his attendance at a May 14, 2008 meeting between Walsh and Stadtmiller. At that time, Walsh explained the reasons underlying her decision to terminate Stadtmiller's employment. (Id. at 4). Holt wrote:

> [Walsh] explained to Shane that his performance was not meeting the standard of the department, and that he was in his orientation period, which was resulting in his termination. Shane appeared to be surprised by this, and said that he had completed his current task. Also, that he felt he was not mentored enough, and "once you show me what to do, I get it done." He explained that he completed the work she requested, and gave her what appeared to be the project work. Colleen explained to Shane that they had done one to one meeting [sic] almost every week, she had to have him complete reworks multiple times, and even he was frustrated with the job. Shane nodded his head in agreement. Colleen then explained that he had good leadership abilities, great credentials, but he was not a good fit for this job.

(Id.).

Stadtmiller was not replaced after his employment was terminated. A new system for managing quality control was being developed, and the Plaintiff's responsibilities were absorbed by others working in that department. (Walsh Depo. 212-13 (ECF No. 42-9 at 56)).

**Standard of Review**

Federal Rule of Civil Procedure 56 provides in relevant part:

(a) Motion for Summary Judgment or Partial Summary Judgment.

A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

\*    \*    \*    \*

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir.2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir.2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23). As the United States Supreme Court has emphasized:

> "[w]hen the moving party has carried its burden
> under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt
> as to the material facts . . . . Where the record taken
> as a whole could not lead a rational trier of fact to
> find for the nonmoving party, there is no genuine
> issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most

favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts

in favor of the nonmoving party. Doe, 242 F.3d at 446; Heller v. Shaw Indus., Inc., 167 F.3d

146, 151 (3d Cir.1999). A court must not engage in credibility determinations at the summary

judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d

Cir.1998). The court's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at

249.

## Discussion

## I. The ADA and RA Failure to Accommodate Claims

Claims of employment discrimination made by those with disabilities are governed by

Title I of the ADA. See 42 U.S.C. §§ 12111-17.[9] Stadtmiller's brief in opposition to the

Defendant's motion for summary judgment makes clear that he is alleging a single Title I claim:

that UPMC refused to "provide reasonable accommodations for medical conditions arising out of

_____

[9] Section 12112(a) of the ADA provides:
> No covered entity shall discriminate against a qualified individual with a
> disability because of the disability of such individual in regard to job
> application procedures, the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms, conditions, and
> privileges of employment.
42 U.S.C. § 12112(a).

[his] combat injuries," and that this refusal resulted in poor job performance which ultimately cost him his job. (ECF No. 48 at 1).[10]

The Court of Appeals for the Third Circuit has defined the parameters of a failure to accommodate claim:

> The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does not "'mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].' . . . "Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith". . ., under what has been termed a duty to engage in the "interactive process."

Williams v. Phila. Hous. Auth. Police Dept., (internal citations omitted), see 42 U.S.C. §12112(b)(5)(A) (2000). [11]

In order to survive summary judgment on a failure to accommodate claim under the ADA or the RA,[12] a plaintiff must point to evidence in the record sufficient to establish that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his

---

[10] A reasonable accommodation is one involving "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; . . . ." 29 C.F.R. § 1630.2 (o)(1)(ii).

[11] Failure to accommodate claims are distinct from claims of disparate treatment, and are differently analyzed. See Walton v. Mental Health Assn. of Southeastern Pa., Civ. A. No. 96-5682, 1997 WL 717053, at *10 (E.D. Pa. Nov. 17, 1997) (disparate treatment and failure to accommodate claims are "analytically distinct"). Reasonable accommodation claims are not governed by the shifting-burden scheme set out in McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 263-64 (1st Cir. 1999). These claims "do[ ] not require that an employer's action be motivated by a discriminatory animus directed at the disability." Id. at 264.

[12] "The Rehabilitation Act . . . prohibits disability-based discrimination by government agencies and other recipients of federal funds . . . ." Kralik v. Durbin, 130 F.3d 76, 78 n.2 (3d Cir. 1997) (quoting Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1514-15 (2d Cir. 1995)). "The ADA has a broader scope as it defines a 'covered entity' as 'an employer, employment agency, labor organization, or joint labor management committee.' 42 U.S.C. § 12111(2). Certain employers, however, are not included within section 12111(2). See 42 U.S.C. § 12111(5)." Id.

19

employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 246 (3d Cir. 2006).

The court of appeals reviewed the ADA regulations, which provided:

> "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359.

Taylor v. Phoenixville School Dist., 184 F.3d 296, 311 (3d Cir. 1999)(alterations in original). "[I]t is the employee's initial request for an accommodation that triggers the employer's obligation to participate in the interactive process . . . . If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." Taylor v. The Principal Fin. Grp, Inc., 93 F.3d 155, 165 (5th Cir. 1996).

The interactive process called for in the regulations "requires 'a great deal of communication'" through "which the employer and the employee determine the appropriate reasonable accommodation." Rehling v. Chicago, 207 F.3d 1009, 1015 (7th Cir. 2000) (quoting Bultemeyer v. Fort Wayne Comm. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)). Nonetheless, "there is no per se liability under the ADA if an employer fails to engage in an interactive process . . . ." Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir. 2000); Rehling, 207 F.3d at 1015-16 (because the interactive process is not an end in itself,

it is not sufficient for plaintiff to show an employer's failure to engage, or responsibility for breakdown in process; failure to engage will not "render an otherwise reasonable accommodation unreasonable").

Stadtmiller's account of his requests for accommodation and UPMC's response expanded over time. In October 2008, when he filed a Discharge Intake Questionnaire for the Equal Employment Opportunity Commission ("EEOC"), he alleged that his employment with UPMC was terminated in violation of the ADA and that UPMC failed to accommodate his disabilities. (ECF No. 42-6 at 16). When asked to describe when he had made UPMC management aware of his disability and UPMC's response, Stadtmiller wrote: "I advised my supervisor of my traumatic brain injury in late February, 2008. With regard to my hand injury, my supervisor was made aware of limitations in note-taking in January 2008 and authorized me to record meetings on my voice recorder." (Id. at 19 ¶ 9). Describing his need for reasonable accommodation, Stadtmiller wrote: "When I advised my supervisor of my traumatic brain injury, I requested scheduling flexibility so that I could renew my treatment. With regard to my hand injury, I requested, and was granted, permission to use a voice recorder to assist with notetaking." (Id. at 20 ¶ 11). On the EEOC form, there was no mention of delay, denial of any other requested accommodation, or allegation that UPMC failed to participate in good faith in an interactive process.

Stadtmiller now contends that UPMC failed to engage in good faith consideration of a wide range of requests for accommodation:

> [S]tadtmiller requested that he be allowed to work in a "room", [sic] he then requested that he be moved to another cubicle with higher walls, he also requested that he be assigned a "coach", [sic] he also requested additional time to be allowed to demonstrate that he could perform his duties with reasonable accommodations,

> he also requested consideration for placement in other jobs.
> He also requested that the "Microsoft Office" program
> called "Project Manager" which would allow him to break
> down "multiple tasks" is something he had "utilized in
> the past" when he was in Iraq. . . . He also requested additional
> training[.]" He also informed them that the modifications
> to his cubicle were not adequate to eliminate the
> distractions or the light sensitivity . . . . He asked for a cubicle
> that was a little more "isolated."

(ECF No. 49 ¶ 70).

A number of components of Stadtmiller's failure to accommodate claim can be summarily addressed. The first is his contention that UPMC failed to accommodate his limited ability to multi-task when it refused a group of project managers' request to use Microsoft rather than Excel software. The record is devoid of evidence that Stadtmiller tied this group request to his alleged disability or that he framed the request as one for accommodation. Stadtmiller's deposition testimony makes this clear:

> Q    Did you ever ask for Microsoft . . . Office?
>
> A    Yes. The project managers got together, and they
>       asked for that and it was denied.
>
> Q    All of the project managers?
>
> A    All the project managers. You can ask the other
>       project managers. It was brought up with [Walsh]
>       in a meeting on a couple of occasions.
>
> Q    So this wasn't something that you yourself
>       requested. This was a joint request?
>
> A    I had utilized it in the past when I was in Iraq and
>       some of my peers had.
>
> Q    You did you have a software program you were using?
>
> A    We used Excel. It's not really made for numbers.

(ECF No. 42-4 at 24). Similarly, the record fails to establish that he requested additional time to demonstrate that he could perform his duties. Although he did contact human resources about the possibility of transferring to another job, the record shows that this request was *not* one for accommodation, but was motivated, ironically, by the fact that he found his job too easy. (ECF No. 51-9 ¶ 4). "The telephone interviews involved data collection and, like data entry, seemed to be more clerical than managerial. Because these assignments did not seem to fit my job title as 'project manager,' my training, experience, education and salary level, I contacted human resources . . . ." (Id.).[13] With respect to the other accommodation requests referenced here, the record establishes that the Defendant considered them, explaining to Stadtmiller its decisions regarding each request. In order to evaluate the arguments of both parties, a detailed examination of relevant portions of the record is required. According to Stadtmiller, he raised accommodation issues with Walsh and human resources personnel. The first request – that he be allowed to use a voice recorder to take meeting notes – was presented to Walsh. There is considerable confusion over when the request was made, how it was presented, and the nature and timing of Walsh's response. As the court already noted, in his November 2010 EEOC charge, Stadtmiller stated that he discussed his hand injury and difficulty taking notes with his supervisor in January 2008, and that she "authorized [him] to record meetings." (ECF No. 42-6 at 19). In his affidavit, Stadtmiller states that he did not ask for a voice recorder until "the end of

---

[13] Even if the court were to assume that Stadtmiller's request for an alternate position was one for accommodation, proof of such a general request is insufficient to defeat a motion for summary judgment. "[I]f, after an opportunity for discovery, the employee still has not identified a position into which [he] could have transferred, the court must grant summary judgment in favor of the defendant." Castellani v. Bucks Cnty. Municipality, 351 F. App'x 774, 777 (3d Cir. 2009) (quoting Shapiro v. Twp. of Lakewood, 292 F.3d 356, 360 (3d Cir. 2002)); see Barclay v. Amtrak, 435 F. Supp. 2d 438, 447 (E.D. Pa. 2006). Stadtmiller failed to identify any such position. "[T]he ADA does not require an employer to create a new position to accommodate a disabled employee or to shift the essential functions of the position to other employees." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999) (citing Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)); 29 C.F.R. § 1630, app. § 1630.2(o).

February 2008." (ECF No. 51-9 ¶ 5). In his deposition, he states that he asked for permission to use the voice recorder "[a]round the time that [he] had the talk with [Walsh] about everything," which would have been the second or third week of March 2008. (Stadtmiller Depo. 124 (ECF No. 42-3 at 27)). He states that he asked to use the recorder first in January or February 2008, and then again in March 2008. (Stadtmiller Depo. 125 (Id. at 28)). Given the evidence of record, it is impossible to determine the length of time between Stadtmiller's request for the recorder and date on which he began to use it. When Stadtmiller was asked at his deposition about the length of the delay, he responded, "Off the top of my head, I have no idea." (Stadtmiller Depo. 124 (Id. at 27)). In any event, if Walsh was asked about the device prior to March 2008, it is clear that at that time she did not have full information regarding the extent of Stadtmiller's impairments.

Stadtmiller concedes that he did not discuss additional accommodations with Walsh until the second or third week in March 2008, when he revealed to her the full extent of his impairments. Walsh remembers, and her notes indicate, that this conversation did not take place until April 9, 2008. The parties, however, agree on the substance of what took place during that meeting. Stadtmiller stated that after he discussed his injuries with Walsh "she seemed fairly supportive for the most part." (Stadtmiller Dep. 119 (Id. at 22)). Without his having to bring it up, she asked if he wanted to be moved to another location. Stadtmiller's response was equivocal. "[He] said that would be the best; however, all of [his] peer interaction – [he] would be isolated." (Stadtmiller Depo. 88 (ECF No. 42-2 at 41)).[14] He added that he "had all of these

---

[14] At the time of this conversation, Stadtmiller's work area was a corner cubicle in a bank of nine others. The space around him was a dead-end walkway - not a high traffic area. (Ursiny Depo. 37-39 (ECF No. 42-11 at 13)). Occupants of the other cubicles passed by Stadtmiller's work area, but there was no public access.

lists of different doctor's appointments that [he] ha[d] to go to. [He] provided that to her along with a stack of additional documentation, and she told [him] to stop down to Human Resources and talk to them about that, about [his] TBI." (Stadtmiller Depo. 119 (ECF No. 42-3 at 22)). Stadtmiller concedes that he requested and Walsh gave him scheduling flexibility so that he could attend medical appointments. (Stadtmiller Depo. 141(Id. at 44)).[15]

Human resources' records show that on April 9, 2009, Stadtmiller visited that department where he had an unscheduled meeting with his assigned representative, Lipscomb-Jones. Lipscomb-Jones testified at her deposition that Stadtmiller began this meeting by expressing concern over his inability to concentrate. (Lipscomb-Jones Depo. 35-36 (ECF No. 42-12 at 12)). It was only then that she was made aware of the existence of his multiple medical issues, including traumatic brain injury. (Lipscomb-Jones Depo. 33 (Id.)). In response to this revelation, Lipscomb-Jones gave Stadtmiller a "physical capacities – like an accommodation form that we ask the employee – we ask them what they need, and then we have them ask their [medical] provider to complete a physical capacities form so that we can address whatever their needs are." (Lipscomb-Jones Depo. 50 (Id. at 16)).

Stadtmiller stated that during this meeting he asked whether there was additional job training that he could take, or an available job coach, and was told that neither was available. (Stadtmiller Depo. 105 (ECF No. 42-3 at 8)). By the time this conversation took place, Lipscomb-Jones was well aware of Stadtmiller's performance-related problems, and that Walsh had given him extra help and attention, and had assigned him two experienced mentors.

---

[15] Stadtmiller contends that this conversation took place during the second or third week of March 2008, prior to his receipt of the warning. (Stadtmiller Depo. 86-87 (ECF No. 42-2 at 39-40)). He denies that Walsh and he discussed his work hours. He contends instead that flex-time was available to anyone in the department, and that though he requested flex-time in December 2007, the request was not one for accommodation, and had nothing to do with his impairments. (Stadtmiller Depo. 128-29 (ECF No. 42-3 at 31-32)).

Stadtmiller admits that he received supplemental instruction, and does not suggest what additional benefit a job coach might have provided beyond what had already been available to him.  (Stadtmiller Depo. 78 (ECF No. 42-2 at 31)).

In an email to Walsh dated April 14, 2008, the Plaintiff confirmed that he had visited human resources.  (ECF No. 42-6 at 9).  During his deposition, Stadtmiller testified that at some point "well before the 14th," he had spoken with a male human resources representative about "an ideal environment."  (Stadtmiller Depo. 131-32 (ECF No. 42-3 at 34-35)).  Lipscomb-Jones testified that Stadtmiller spoke to this alternative representative because, for reasons she did not know, he was dissatisfied with her.  Stadtmiller asked the male representative about a specific unoccupied office with a door and the potential for indirect lighting, but was told that the space was "off the table" because the office was on a different floor from the rest of Stadtmiller's unit, and was, in fact, assigned to a different department.  (Stadtmiller Depo. 132 (Id. at 35)).  This representative also denied the Plaintiff's request for a larger cubicle because it was already occupied by one of Stadtmiller's co-workers.  Stadtmiller's request to move to a little more isolated cubicle was rejected because he was already situated in a quiet area.  (Ursiny Depo.  37-41 (ECF No. 42-11 at 13-14)).

When these requests were denied, the human resources representative asked Stadtmiller whether he would like a partition in his cubicle.[16]  At some point around the middle

---

[16]Stadtmiller's testified at his deposition:

> Q.    My question is did you request those changes to your cubicle?
>
> A.    No, I didn't.  It was offered.  They asked me if I would like a partition.  I had mentioned that there was another cubicle that was a little more isolated in the same group that one of my peers had . . . and that's when they offered a partition to be put up. . . .

(Stadtmiller Depo. 89-90 (ECF No. 42-2 at 42-43)).

of April 2008, a modification was made to his cubicle.  Stadtmiller was displeased with the alteration because it was not exactly like the one in his co-worker's cubicle, and apparently did not completely block his view of people passing, or eliminate noise.  Stadtmiller failed, however, to point to anything in the record to suggest that UPMC's failure to construct the ideal partition was indicative of bad faith.  "Not all requested accommodations are appropriate, and the ADA only 'provides a right to reasonable accommodation, not to the employee's preferred accommodation.'"  Aquart v. Ascension Health Info. Serv., No A-09-CA-804, 2011 WL 233587, at *6 (W.D. Tex. Jan. 24, 2011) (quoting EEOC v. Agro. Distrib., LLC, 555 F.3d 462, 471 (5th Cir. 2009)); see Bielski v. Green, 674 F. Supp.2d 414, 424 (W.D. N.Y. 2009) (employee cannot insist on particular accommodation if employer provides another reasonable accommodation instead) (collecting decisions).

On April 14, 2008, Stadtmiller and his doctor signed the completed physical capacity form and returned it to human resources.  (ECF No. 42-6 at 11-14).[17]  The same day, Lipscomb-Jones spoke to Walsh "to confirm that Stadtmiller had a [voice] recorder available."  (Lipscomb-Jones Depo. 54 (ECF No. 42-12 at 14)).  Although Stadtmiller is unable to say when he began using the recorder, the evidence shows that he recorded meeting notes as early as April 8, 2008, before he approached human resources.  (ECF No. 42-6 at 30).  Lipscomb-Jones recalled verifying that Stadtmiller had been provided with a "higher cube . . . to decrease the

---

[17]One entry made by Dr. Lan, Stadtmiller's primary care physician, indicated that the Plaintiff was unable to perform fine manipulation with his right hand and that it would be *beneficial* for him to use a voice recorder for note taking.  (ECF No. 42-6 at 12) (emphasis added).  Dr. Lan indicated that Stadtmiller was able frequently – defined as thirty-four to sixty-six percent of the time – to prepare reports or forms, read, understand, and comply with numerous policies and procedures, observe people and events, supervise train or evaluate other personnel, exhibit good judgment and problem solving, communicate well, and interact courteously with co-workers and members of the public.  (Id. at 14).  Associated with these observations was the following comment: "Isolated working area with few distractions would be *of benefit*, sensitivity to light and sound."  (Id.) (emphasis added).  UPMC made accommodations addressing each of the concerns raised by Dr. Lan, with the exception of light sensitivity.

distractions," and that there had been "some . . . modifications to his schedule."  (Lipscomb-Jones Depo 53, 81 (ECF No. 42-12 at 17, 24)).  Both Lipscomb-Jones and Walsh testified that they were never told by Stadtmiller or anyone else that the provided accommodations were inadequate.  (Lipscomb-Jones Depo. 123 (Id. at 34)).

The Court of Appeals for the Third Circuit discussed in detail the nature and purpose of the ADA's interactive process in its decision in Taylor v. Phoenixville School District, 184 F.3d 296 (3d Cir. 1999).  Particularly relevant is the court's discussion of what will be deemed to constitute good faith on the part of the employer:

> Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome.  These steps are consistent with the recommendations in the EEOC's interpretive guideline.  See 29 C.F.R. pt. 1630, app. § 1630.9 at 359-61.

Id. at 317.  The record leaves no doubt that UPMC participated in the interactive process and that its actions closely approximated the steps found by the court in Taylor to have been indicative of good faith.

Although Stadtmiller recognizes that UPMC made some effort at providing accommodations, he states that the record demonstrates that UPMC was merely "going through the motions"; i.e., its participation in the interactive process was, in fact, a sham.  In support of this contention, Stadtmiller relies on the delay between his first request for a voice recorder and the time that he was given permission to use it, and on a small portion of Walsh's deposition

testimony in which she discusses her notes regarding the March 3, 2008 performance warning.

The Plaintiff draws the court's attention to the following excerpt from Walsh's testimony:

Q       When in advance of [March 31, 2008] was [the warning]
        sent to HR?

A       I'm not sure.

Q       How did you send it to them?

A       This I drafted, and it would have been sent by e-mail to HR
         for their review.

Q       And the content of this document was approved by whom?

A       Kim [Lipscomb]-Jones.

Q       In Exhibit 9, at Page 0179, you indicate, I advised Shane,
        I'll complete the six-month evaluation by next Wednesday,
        April 16; did you do that?

A       That evaluation did not occur because of the termination.

Q       So the evaluation was supposed to occur as of April 16th?

A       The six-month evaluation would have been due at the 16th
        and his termination date was the 20th.

Q       His termination was in May of 2008?

A       Correct.

Q       And his termination was to be done as of April 16
        according to this document, and that six-month
        evaluation did not occur, according to you, because
        of your decision to terminate him; is that correct?

A       No.  This evaluation of 4/16 did not occur, and again, we
        have to concur with HR because this was tied with
        the fact that this was an evaluation, basically.

Q       You're talking about March 31?

A       This is the performance warning with the responsibility
        for improvement.  So it took the place of the

> evaluation.
>
> Q    When was that determination made, that the March 31st,
>      2008 warning, . . . was going to take the place of the
>      six-month evaluation that you told Mr. Stadtmiller on
>      April 9th, would be supplied to him to April 16th?
>
> A    I can't say, somewhere between this date and this date.
>
> Q    Why would you tell Mr. Stadtmiller on April 9th, if
>      you were already informed by HR that the March 31st
>      document would serve as the six-month evaluation, why
>      would you tell Mr. Stadtmiller that the six-month evaluation
>      would be done by next month, April 16th?
>
> A    At that time, that's what I had intentions to do.  I can't
>      recall the exact date of my conversations with HR
>      around that, but that evaluation did not occur.
>
> Q    Do you recall after April 9, 2008 when you had the
>      conversation with HR, where they told you not to do
>      the April 16th six-month evaluation?
>
> A    There was conversation around then, I can't quote
>      you the specifics.  [It] was based on  -- the six-month
>      evaluation tells you what you need to do and how you
>      are doing and this was what this was (indicating).
>
> Q    You mean Exhibit 11?
>
> A    Correct.  It tells Mr. Stadtmiller how he is doing and
>      what he has to do for improvement.  It's the intent of
>      the six-month evaluation.

(Walsh Depo. 145-47 (ECF NO. 42-9 at 39-40)).  According to Stadtmiller, this exchange

establishes that UPMC "had already decided to terminate Stadtmiller's employment, within days

of receiving [his] physical capacities form," and, therefore, UPMC did not demonstrate good

faith in the interactive process.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 12 (ECF No.

48)).  This argument does not bear the weight that Stadtmiller places upon it.

First, the document referenced is a single page of Walsh's handwritten notes made at a weekly meeting with Stadtmiller on April 9, 2008, the date on which Walsh contends that he first advised her about the extent of his combat-related impairments. Stadtmiller stated that on that date Walsh seemed supportive. She stated that she gave him permission to keep medical appointments and to adjust his schedule to allow him to avoid the stress he experienced with heavy morning traffic. Walsh mentioned that she promised Stadtmiller a six-month evaluation by April 16, 2008. Stadtmiller, however, was hired on November 19, 2007. Therefore, his six-month evaluation would not have been due until May 2008. When Walsh was asked whether the evaluation was due on April 16, 2008, she replied, "The six-month evaluation would have been due at the 16th, and his termination date was the 20th." (Walsh Depo. 145 (ECF No. 42-9 at 39)). She was then asked, "His termination was in May of 2008?" She responded, "Correct." (Id.)

The state of the record leaves significant room for confusion regarding when the six-month evaluation was actually to take place. If it was on May 16, 2008, which was within three days of Stadtmiller's six-month anniversary, it made sense to cancel the evaluation because, by that point, the decision to terminate his employment was final. If the evaluation was to take place in mid-April, it also made sense to forego the evaluation since, as the human resources representative indicated, Stadtmiller had received a detailed evaluation only two weeks earlier, on March 31, 2008. Walsh's use of the word "termination" at this point in her deposition is insufficient to raise an inference that all accommodation efforts made by Walsh and by UPMC human resources representatives after he returned his physical capacities form were undertaken in bad faith. This is particularly true given that Stadtmiller refers to the March 31, 2008 warning as his *three-month* counseling, thus undermining his contention that his six-month evaluation was due in the middle of April 2008. (Stadtmiller Depo. 100 (ECF No. 42-3 at 3)).

Even if the six-month evaluation had been due on April 16, 2008, the record contains nothing beyond rank speculation to connect the decision to cancel it and the receipt of Stadtmiller's physical capacity form. That form contained nothing that Stadtmiller had not revealed to Walsh weeks earlier, and to Lipscomb-Jones at the time she gave him the form. Furthermore, the record does not contain any evidence showing that Walsh saw or was made aware of the contents of the physical capacity form or what about that form in particular would have led her to terminate his employment.

Having carefully examined the record in its entirety, the court finds that the evidence is insufficient to permit a reasonable fact-finder to conclude that UPMC failed to engage in the interactive process or that it acted in bad faith in doing so. Even after the March 31, 2008 warning was issued, Walsh and Stadtmiller's co-workers continued to help him with his work, met with him to explain in detail what needed to be done, permitted him to use a voice recorder, modified his work hours, permitted him to attend every scheduled doctor's appointment, and attempted to modify his cubicle in a manner that would reduce noise and visual distraction.

The court's conclusion is not altered by Stadtmiller's argument that UPMC's lack of good faith is demonstrated by its delay in implementing his request for a voice recorder, or his contention that too little time was allotted to see if the accommodations put in place were effective before he was terminated. Any argument based on delay is disingenuous in light of the length of time that Stadtmiller waited to reveal the extent of his impairments and to request accommodation, especially given that he knew – or certainly should have known – at the time he began his employment that there were environmental factors at UPMC which would impact his performance. Stadtmiller admits that he did not share any details of his disability or its effects

with UPMC until he asked to use a voice recorder, and that it was at least four months after joining the organization before he first revealed the full impact of his disability to anyone.

By the time he requested accommodation, months after he began work, Stadtmiller had exhibited numerous, significant, and persistent performance issues, which he failed to recognize, minimized or denied and did not successfully address. Though he claims to have had serious impairments including excruciating headaches brought on by fluorescent lights and severe problems with memory and concentration, it was not until he had already received a warning notifying him that he was in danger of losing his job that he chose to approach human resources regarding his need for accommodation. When he did reveal the extent of his impairments, UPMC did not exhibit undue delay in putting accommodations in place. Stadtmiller was using a voice recorder prior to his April 2008 visit to human resources, and his schedule was adjusted during his revelatory conversation with Walsh. Depending on which version of Stadtmiller's testimony is credited, a modification was made to his cubicle before or very soon after he returned the physical capacity form completed by his physician.[18]

The court finds that Stadtmiller failed to raise a material question of fact regarding UPMC's good faith participation in the accommodation process, and that he, therefore, failed to establish a critical element of his prima facie claim for failure to accommodate – " his employer did not make a good faith effort to assist" or accommodate him. See Armstrong, 438 F.3d at 246 (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317-20 (3d Cir. 1999)). Although this

---

[18] On April 15, 2008, Stadtmiller sent an email to Walsh, stating: "Patty has a larger divider that was added to her cube. Could I have one added? Patty says it has been very helpful to her." (ECF No. 42-6 at 10). In his deposition testimony, Stadtmiller first characterized this email as a request for a cubicle. (Stadtmiller Depo. 91 (ECF No. 42-2 at 44)). He stated that when he was told that he could not have Patty's cubicle, he asked, in the email, for a divider. When he was asked whether the email resulted in the modification to his own cubicle, he answered that he did not know. (Stadtmiller Depo. 92 (Id. at 45)). He stated that the email "could" be a complaint about the divider he was given. "[T]he one I ha[d] [was] too small." (Id.).

finding alone is a sufficient ground upon which to grant the Defendant's motion for summary judgment on the failure to accommodate claim, it is important to note that Stadtmiller also failed to meet his burden with respect to the fourth prong of this claim – he could have been reasonably accommodated. See id.

It is Stadtmiller's burden to show that the accommodations that he contends were requested and denied would have rendered him capable of performing the essential functions of his job as a quality control manager with or without accommodation. See Stanley v. Lester M. Prange, Inc., 25 F. Supp. 2d 581, 584 (E.D. Pa. 1998). If a plaintiff is unable to make this showing, the employer avoids liability altogether on a failure to accommodate claim. The plaintiff must "'supply evidence sufficient [to] allow a jury' to conclude that reasonable accommodations could or should have been fashioned that would have allowed him to perform [his job] in a manner that would meet or exceed [the employer's] legitimate expectations and satisfy the essential functions of that position." Hammell v. Eau Galle Cheese Fact., 407 F.3d 852,863-64 (7th Cir. 2005) (quoting McPhaul v. Bd. of Comm'rs, 226 F.3d 558, 563 (7th Cir. 2000)). Thus, summary judgment may be granted for a defendant "in cases in which the plaintiff's proposal [would be] clearly ineffective . . . ." Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 670 (3d Cir. 1999). So it is here.

By the middle of April 2008, UPMC had attempted to address each of the accommodation requests that Stadtmiller can be shown to have made, with the exception of elimination of fluorescent lighting.[19] Walsh stated that despite these efforts Stadtmiller failed to

---

[19] Stadtmiller fails to suggest how his issues with the lighting could have been eliminated other than by giving him one office that he identified on a separate floor, which was assigned to a different department. Walsh does not remember Stadtmiller raising the lighting issue with her. She pointed out, however, that even had UPMC acceded to his request, it was far from certain that the accommodation would have been successful, as Stadtmiller would still have been required to spend significant time outside of his office, in areas without modified lighting. Walsh stated:

demonstrate improvement in attention to detail and organization.  Though "[h]e knew he had another project due, he paid no attention to it."  (Walsh Depo. 152 (ECF No. 42-9 at 41).  At the end of April 2008, he was given extra time and instruction on what Walsh characterized as a straightforward comparison between two years of data.  (Walsh Depo. 139 (ECF No. 42-9 at 38)).  As of May 8, 2008, he had yet to begin work on the assignment.  (Walsh Depo. 142 (Id. at 49)).[20]  The same day, Walsh emphasized to Stadtmiller that he needed to focus on managing work team meetings, multi-tasking, and completing work that was "timely, accurate, complete, and usable."  (ECF No. 42-10 at 28).  She also commented again on Stadtmiller's lack of understanding of the 2009/2009 work plan or the intent of a project, referred to as the "RRU

---

> I think it would have needed to have been much further evaluated.
> Much of his work was outside of his work area, whether it be
> a cube or an office.  His work was running work meetings, etc.,
> so if that were something to be considered, it would require
> further evaluation.

(Walsh Depo. 124 (ECF No. 42-9 at 34)).  Ninety percent of the meetings of project managers were face-to-face.  (Walsh Depo. 127 (Id. at 35)).  They took place around cubicles for easy communication.  (Walsh Depo. 128 (Id. at 35)).  Meetings with Walsh took place in her office, and other group meetings were held in conference or work rooms.  Ursiny testified that lighting throughout the floor where Quality Control was located was "[o]verhead fluorescent lights throughout the floor and then each cubicle had overhead fluorescent lights beneath the partitions up top."  (Ursiny Depo.89 (ECF No. 42-11 at 26)).  Stadtmiller has not suggested that the lighting in these areas where he was required to spend a great deal of time could have been modified.

[20] In early May 2008, Walsh began to hear troubling reports about Stadtmiller.  One of the Plaintiff's co-workers reported that Stadtmiller had commented that her office had a good view of the Duquesne campus, and would be a good place "for a sniper wanting to take someone out."  (Walsh Depo. 161 (ECF No. 42-9 at 43)).  He also told a co-worker that the police were called when he engaged in a fight "with a man who was bothering his wife."  (Walsh Depo. 161 (ECF No. 42-9 at 43)).  He read an email on this co-worker's computer screen, asked who had sent it, and stated that he found it "inappropriate."  (Id.).  Another of Stadtmiller's co-workers told Walsh that he observed Stadtmiller take a knife from his pocket and cut away part of a fence around the former St. Francis property.  (Walsh Depo. 178 (Id. at 48)).  A third co-worker who walked with Stadtmiller to the parking garage stated that Stadtmiller got on a child's bicycle that was parked on the street, and, after getting off, threw the bicycle over a fence.  (Walsh Depo. 180 (Id.)).  Walsh contends that none of this information – aside from Stadtmiller's absences from work and meetings – figured in her decision to terminate his employment.  "There was so much going on with his work performance, so I continued to focus on that, and my goal was just to let HR know about this situation and let them deal with it."  (Walsh Depo. 163 (Id. at 44)).

Project" (Walsh Depo. 138 (ECF No. 42-9 at 38)), despite his having received multiple explanations. Stadtmiller left in the middle of a meeting with no other explanation than that he had "work to do." (Walsh Depo. 157-58 (Id. at 42-43)). He left for a dentist appointment without letting Walsh know, and on multiple occasions when she needed him, she could not find him. (Walsh Depo. 134-35 (Id. at 37), Walsh Depo. 153 (Id. at 41)). She did not have this issue with other project managers. (Walsh Depo. 135 (Id. at 37)).

Walsh commented on her observations of Stadtmiller's performance after accommodations were in place:

> The tape recorder did not really improve his performance, and he had the high cube up and that was just a functional change, and we had already switched his work hours. So those were immediate changes to his work environment. But you see, there is no change in his performance
>
>     *   *   *   *
>
> [A]s you can see in my notes, I continually worked with him every day or every other day and things were not improving, his performance was not changing.
>
>     *   *   *   *
>
> There is improved performance on his RA project, which is extremely simple and it took him many, many months to get that done. There is not [sic] improvement on keeping attention to detail and organization. He knew he had another project due and he paid no attention to it. So there was minimal improvement.

(Walsh Depo. 150-52 (Id. at 42-9)).

Stadtmiller does not argue and the record does not support the proposition that his performance would have improved had he been given additional accommodations. In fact, the record shows that Stadtmiller thought that his performance without accommodation was acceptable and took the position that there was little room for improvement. In his deposition, he states that after the March 31, 2008 warning, Walsh did not address the same concerns again; her comments about his work were "mostly positive." (Stadtmiller Depo. 79 (ECF No. 42-2 at32)). "My performance was satisfactory . . . if you're on a losing football team, that doesn't make you a terrible football player." (Stadtmiller Depo. 149 (ECF No. 42-4 at 2)). Walsh did not criticize his work any more than she did the work of his peers. (Stadtmiller Depo. 79 (ECF No. 42-2 at 32)). In his third amended complaint, Stadtmiller makes the claim that Walsh and Holt "provided no explanation . . . for the termination of his employment." (ECF No. 36 ¶ 16). This statement is flatly contradicted by the record,[21] as is the statement on his EEOC Intake Questionnaire, that prior to his termination, he had never received verbal or written counseling or notice of any performance deficiency. (ECF No. 42-6 at 25). When asked during his deposition whether he believed that Walsh had been genuinely dissatisfied with his performance, he replied:

---

[21] In addition to the oral explanation provided at the termination meeting, Stadtmiller was given a letter dated May 14, 2008, signed by Walsh. She wrote:

> On March 31, 2007, you were issued an Orientation Period Performance Warning to address your inability to meet expectations regarding work team management and accurate completion of work plans needed to drive the projects you were assigned. You were provided with additional instruction, and were encouraged to ask questions and seek assistance as needed.
>
> Since your Performance Warning, several concerns have been identified, including inaccurate, incomplete and unclear work plans, and difficulty handling multiple tasks. Work plans are just a component of your position; expectations of the Project Manager position have not been met.

(ECF No. 42-6 at 1).

> I think she had unrealistic expectations of all
> her staff, and it wasn't my performance. It was
> the fact that I wasn't a clinician, and I was going
> to require training and time that she didn't want
> to invest. That's what I think.

(Stadtmiller Depo. 167 (ECF No. 42-4 at 19-20)).[22]   The record leaves little doubt that

Stadtmiller's performance was inadequate before he requested accommodation and did not

improve significantly – or at all – after accommodations were made. The record is devoid of

evidence that modifications in the lighting or a higher partition would have enabled him to

perform his duties in a manner satisfactory to his employer. Thus, the Plaintiff failed to show

that he could meet UPMC's legitimate job expectations with or without reasonable

accommodation of his disability. UPMC is entitled to summary judgment on this claim.

## II. The Claim Made Under USERRA

In 1994, the USERRA replaced the Veteran's Reemployment Rights Act in order to

"'clarify, simplify, and, where necessary, strengthen the existing veterans' [including reservists']

employment and reemployment rights provisions.'" Warren v. Int'l Bus. Machs. Corp., 358 F.

Supp. 2d 301, 309 (S.D.N.Y 2005) (quoting Gummo v. Village of Depew, 75 F.3d 98, 105 (2d

Cir. 1996). The USERRA is intended:

> (1) to encourage noncareer service in the uniformed
> services by eliminating or minimizing the disadvantages to
> civilian careers and employment which can result from
> such service;
>
> (2) to minimize disruption to the lives of persons
> performing service in the uniformed services as well as to
> their employers, their fellow employees, and their
> communities, by providing for the prompt reemployment of
> such persons upon their completion of such service; and

---

[22] In this statement, Stadtmiller articulates a disability-neutral reason for his termination, effectively
negating the viability of any claim that his termination was the product of discrimination based upon
disability. The record bearing on Stadtmiller's performance problems and the absence of pretext are also
fatal to a discriminatory termination claim.

> (3) to prohibit discrimination against persons because of
> their service in the uniformed services.

38 U.S.C. § 4301(a)(1)-(3).

Under the burden of proof allocation applicable in USERRA cases, an employee must show, by a preponderance of the evidence, that his or her protected status as a member of the service was a substantial or motivating factor in an adverse employment action. Once this threshold showing is made, an employer can avoid liability only by showing, as an affirmative defense, that it would have taken the same action despite the employee's protected status. See Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). The court must assess whether there is sufficient evidence from which a jury could find that Stadtmiller's reserve status was a substantial or motivating factor in UPMC's decision to terminate his employment, and, if there is, whether UPMC established that it would have terminated his employment even had he not been a member of the National Guard.

Having reviewed all the record evidence, the court finds nothing to support the inference that Stadtmiller's military status played any role – much less that it was a "motivating factor" – in UPMC's determination to terminate Stadtmiller. First, personnel who participated in Stadtmiller's hiring process, his supervisor, and his co-workers were aware of Stadtmiller's National Guard status and his continuing service obligations at the time or shortly after he was hired. (Stadtmiller Depo. 161 (ECF No. 42-4 at 14)). When asked to explain the basis for his contention that his military service was a motivating factor in his termination, Stadtmiller answered:

> Because before a certain time frame everything seemed to be
> all right, and then after I started my drills and stuff like that,
> it just seemed like they did not have the time for me. I
> would ask questions that one would have an answer to.

> Then it just seemed like I was pushed aside, and they just
> wanted to wait until my time expired and then let me go.
> That's why I think it has to do with my military service because
> they knew that once a month I would be having to do my duties
> as a commander of the unit I was with and possibly my
> deployment. That's what I think.

(Stadtmiller Depo. 154-55 (Id. at 7-8 )). Stadtmiller admitted that during the course of his

employment at UPMC, he was never denied time off to fulfill his military commitments and that

he was never told he was being terminated because he was a member of the uniformed services.

(Stadtmiller Depo. 157-58 (ECF No. 42-4 at 10-11)). Stadtmiller claimed that he was never

provided with an explanation for his termination, but stated that someone, whose position and

status were unknown to him, had said something negative about his service:

A    I think her name was Vicki. My first week she asked me if I killed
anybody. That's kind of negative.

Q    Who is Vicki?

A    Our office moved from one area to the other, and she worked for Mark
over in a department, but she asked me if I ever killed anybody.

Q    Is Vicki a supervisor?

A    She works in the department.

Q    She works where?

A    She works in Colleen's department.

Q    Is she a supervisor?

A    What was the question again?

Q    Is Vicki a supervisor?

A    I don't know what her title was.

Q    Was she your supervisor?

> A      She could have been in charge of [Walsh] for all I knew. I don't know.
>
> Q      So you don't know who she was?
>
> A      Her desk was in the area I was in my first week there, so when you start at a place, names and faces are very vague.
>
> Q      Did Vicki ever have any supervisory responsibility over you?
>
> A      It's funny you ask that because I have no idea what the organizational structure was.
>
> Q      Is your answer you don't know?
>
> A.      I don't know what her job was.

(Stadtmiller Depo. 159-60 (ECF 42-4 at 12-13)). Stadtmiller did not recall anyone else saying anything negative about his service commitment. (Stadtmiller Depo. 160-61 (ECF No. 42-4 at 14)).

Stadtmiller does not cite authority for the proposition that the type of evidence reflected in the record is sufficient to raise an inference of discrimination in violation of the USSERA. The court finds that it is not. Stadtmiller was hired as part of a program that honored his uniformed service and UPMC was aware that Stadtmiller was in the West Virginia National Guard, with continuing service requirements. (Stadtmiller Depo. 58, 61, 63 (ECF No. 42-2 at 12, 14, 16)). The evidence cited by Stadtmiller would not permit a reasonable fact-finder to conclude that his termination was effected as a result of his service obligations.

As the court already recounted in detail, no reasonable jury could find that the reason given for his termination – that Stadtmiller was terminated because his job performance was unsatisfactory – was pretextual. A reasonable jury could only conclude that these shortcomings, rather than his uniformed service, brought about his termination. The Defendant is, therefore, entitled to summary judgment on the Plaintiff's USERRA claim.

### III. State Law Claims

Two claims remain – one brought pursuant to Pennsylvania's Military Affairs Act, as amended, 51 PA. CON. STAT. §§ 7301 et. seq., and the other alleging wrongful discharge in derogation of Pennsylvania law.

Supplemental jurisdiction in the district courts is governed by 28 U.S.C. § 1367. This statute provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because granting the Defendant's motion for summary judgment resolves the only extant federal claims, the court, in the exercise of its discretion, declines to retain supplemental jurisdiction over Stadtmiller's state law claims. See King v. Cnty. of Gloucester, 302 F. App'x 92, 99 (3d Cir. 2008) (citing Novak, v. MetroHealth Med. Ctr., 503 F.3d 572, 583 (6th Cir.2007) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.")). The court cannot discern any reason to reach a different result here.

### Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment (ECF No. 39) will be granted with respect to the claims brought pursuant to the ADA, the RA, and the USERRA. The remaining state law claims will be dismissed without prejudice to their being raised in state court. An appropriate order will be entered.

By the Court,
/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: June 29, 2011